**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LILLI A. SACZAK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Judge Ronald A. Guzmán** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner** | ) | **08 C 543** |
| **of Social Security.** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lilli A. Saczak ("Saczak") has appealed the denial of her application for Disability Insurance Benefits.  Before the Court are the parties' cross-motions for summary judgment.  For the reasons provided in this Memorandum Opinion and Order, the Court denies plaintiff's motion and grants defendant's motion.

## Procedural History

On April 1, 2005, Saczak applied for Disability Insurance Benefits ("DIB"), alleging a disability onset date of September 28, 1999.  (R. at 93.)  Saczak's application was denied initially on June 15, 2005, and on reconsideration on September 28, 2005.  (R. at 72-76, 80-84.)  Saczak then filed a timely written request for a hearing.  (R. at 64.)  On February 6, 2007, the hearing commenced with Administrative Law Judge ("ALJ") Shirley Michaelson presiding.  (R. at 41, 42.)  On March 31, 2007, the ALJ issued a thirteen-page written decision finding that Saczak was not eligible for DIB.  (R. at 26, 30, 41.)

On May 29, 2007, Saczak filed a request for review with the Appeals Council.  (R. at 22.)  On August 17, 2007, the request for review was denied, which rendered the ALJ's decision final.

(R. at 11, 22).  *See* 20 C.F.R. § 416.1481 (2008).  Saczak retained new counsel and requested an extension of the filing deadline for a civil action, which was granted.  (R. at 4, 10.)  On January 24, 2008, Saczak brought the instant action.

**Statement of Facts**

On February 6, 2007, the date of the administrative hearing, Saczak was forty-eight years old, measured 5'3" tall and weighed approximately 225 lbs.  (R. at 93, 440.)  Saczak has a GED and has previously worked as a housekeeper, housekeeping supervisor and factory-assembly-line worker.  (R. at 145, 488.)

On September 28, 1999, Saczak reported pain in her right shoulder allegedly as a result of lifting a bucket of water while working at Rosewood Nursing Care.  (R. at 449.)  She was examined by Dr. Rodarte of MedWorks, who found that she had a limited range of motion in the right shoulder that was accompanied by pain and diagnosed her with having a right shoulder strain.  (R. at 451.)  Dr. Rodarte prescribed Tylenol and the use of a sling and stated that Saczak was permitted to return to work on restricted duty.  (*Id.*)  Saczak and Dr. Rodarte also discussed an unspecified gastrointestinal problem that Saczak was experiencing, and Dr. Rodarte recommended that Saczak see her regular physician for treatment.  (*Id.*).

On September 30, 1999, Dr. Goldhaber, also of MedWorks, examined Saczak, who complained of pain that extended from the shoulder to mid-arm.  (R. at 453.)  Saczak also stated that her third through fifth fingers became numb when she bent forward and let her arms hang down.  (*Id.*)  Dr. Goldhaber found no significant damage to Saczak's right arm or shoulder and diagnosed a right shoulder strain.  (*Id.*)  Dr. Goldhaber prescribed continued use of the sling,

2

restricted work duty and physical therapy to relieve the pain.  (*Id.*)  Dr. Goldhaber noted that

Saczak experienced pain when she moved her arm but that she experienced no limitation in her

range of motion.  (*Id.*)  Dr. Goldhaber also noted that Saczak would be re-examined by Dr.

Rodarte in one week, but there is no evidence that Saczak ever returned for a follow-up

examination at MedWorks.  (*Id.*)

On October 18, 1999, Saczak sought a second opinion at the Riverside Community

Health Center ("Riverside").  (R. at 458.)  The examining physician noted that Saczak had some

limited movement in her shoulder due to pain, as well as decreased grip strength in her right

hand.  (*Id.*)  That physician diagnosed a right rotator cuff sprain, prescribed Naprelan and

shoulder exercises and stated that Saczak was expected for a follow-up appointment one week

later.  (*Id.*)  On October 25, 1999, Saczak called Riverside complaining of rectal bleeding and

abdominal pain since starting Naprelan two days prior.  (R. at 457.)  Saczak was advised to

return for an examination, but she failed to return.  (*Id.*)

On May 25, 2000, Saczak was examined by Dr. Fischer at the request of her attorney.

(R. at 459-61.)  Dr. Fischer examined Saczak's shoulder by x-ray and found no abnormalities.

(R. at 460-61.)  A physical examination revealed a marked limited range of motion in Saczak's

right shoulder, and Dr. Fischer diagnosed a probable rotator cuff tear.  (R. at 461.)  Dr. Fischer

recommended a magnetic resonance imaging ("MRI") scan and possible surgical exploration.

(*Id.*)  Dr. Fischer noted that Saczak had not worked since the accident and recommended that

Saczak not return to work pending further treatment.  (R. at 459, 461.)

On September 19, 2000, Saczak was admitted to the emergency room at Provena St.

Joseph Medical Center complaining of "pain from my [right] shoulder to my [right] hand,"

nausea, light-headedness, and excessive sweating. (R. at 302.) Examination revealed no chest abnormalities and no acute bony pathologies in the right shoulder. (R. at 303, 305.) However, the examiner found that a mild degenerative change was suggested in the right acromioclavicular joint, as well as possible calcific bursitis. (R. at 305.) A cardiac examination was normal. (R. at 306.) The examining physician prescribed Vicodin for pain and ordered a follow-up examination within a week. (*Id.*)

On September 30, 2000, Saczak's DIB insured status expired. (R. at 86.)

On October 3, 2000, Dr. Bertolini examined Saczak. (R. at 167.) Saczak complained of numbness in the first two fingers of her hand, pain from her shoulder down her arm and "difficulty working above shoulder level." (*Id.*) Dr. Bertolini noted that Saczak experienced some pain on rotation of her shoulder and neck pain at the extreme range of motion. (*Id.*) He also found Saczak had weakness in wrist extension of her right wrist and decreased sensation in her first two fingers. (*Id.*) Dr. Bertolini reviewed the x-rays of Saczak's right shoulder taken in the emergency room on September 19, 2000, and found that they were within "normal limits." (*Id.*) An MRI scan of Saczak's cervical spine taken in Dr. Bertolini's office on October 3 revealed "mild degenerative changes" at the C5-6 and C6-7 vertebrae. (*Id.*) Dr. Bertolini diagnosed a probable herniated disc at C5-6, as well as impingement syndrome in Saczak's right shoulder. (*Id.*) He prescribed Celebrex and Vicodin for pain, as well as physical therapy three times a week for two weeks for Saczak's shoulder. (R. at 167-68.)

On October 10, 2000, Saczak was examined by a physical therapist. (R. 261-63.) The therapist noted that Saczak's neck movement was within normal limits and pain free, with the exception of left side flexion, which was within "functional" limits and "painful in the terminal

range." (R. at 261.) Saczak's right shoulder was assessed to be within functional limits but with extreme pain in the last fifteen to twenty degrees of shoulder flexion. (*Id.*)

On October 17, 2000, Saczak returned to Dr. Bertolini for a follow-up appointment and complained of "a lot of pain in the neck and right shoulder area." (R. at 168.) An MRI scan revealed a soft tissue herniated disc at C5-6 as well as "spurs impinging on the thecal sac." (*Id.*) Dr. Bertolini diagnosed a herniated disc at C5-6 and a degenerative disc at C5-6 and C6-7. Additionally, he diagnosed continued impingement syndrome in the right shoulder. (*Id.*) He recommended that Saczak continue physical therapy for her shoulder and consult with a neurosurgeon regarding her neck. (*Id.*)

On October 20, 2000, Dr. DePhillips, a neurosurgeon, examined Saczak. (R. at 162.) The examination revealed a "diminished right triceps reflex" but "good motor strength throughout." (*Id.*) Dr. DePhillips reviewed the MRI results and diagnosed disk protrusions at the C5-6 and C6-7 levels, with a foraminal stenosis at the C5-6 level. (*Id.*) He recommended a cervical epidural steroid injection and discussed the possibility of a surgical discectomy and spinal fusion. (*Id.*)

On November 1, 2000, Saczak received a steroid injection in her neck from Dr. Morales. (R. at 164.) The examination revealed a normal range of motion in her cervical spine and no muscle tenderness or trigger points. Dr. Morales found a slight decrease in right side flexion but no abnormal triceps reflex. (*Id.*) Dr. Morales administered the steroid injection with no difficulties. (*Id.*)

On November 7, 2000, Saczak returned to Dr. Bertolini and reported that the steroid injection did not help. (R. at 169.) Dr. Bertolini's examination found full range of motion in

Saczak's right shoulder with the exception of a slight limitation on internal rotation.  (*Id.*)  Dr. Bertolini assessed an improvement in the impingement syndrome and prescribed a refill of Vicodin at Saczak's request.  (*Id.*)  Saczak declined to continue physical therapy and stated that her insurance would not cover it.  (*Id.*)

On November 15, 2000, Saczak reported to Dr. DePhillips that the steroid injection had not helped her condition.  (R. at 160.)  Dr. DePhillips noted that she had reached "maximum medical improvement" and recommended a two-level discectomy and spinal fusion at C5-6 and C6-7.  (*Id.*)

On November 20, 2000, Saczak was examined by Dr. Cole, a shoulder specialist.  (R. at 248-50.)  Saczak stated that she had "severe limitations with overhead activities."  (R. at 249.)  Dr. Cole's examination revealed a "significant" Spurling's maneuver accompanied by significant pain and numbness.  (*Id.*)  However, Dr. Cole found that Saczak's shoulder was within normal limits, and he noted that her condition did not appear to be related to her shoulder.  (*Id.*)  Dr. Cole assessed no limitations in Saczak's shoulder and noted that "[s]he can do all activities."  (*Id.*)  However, he did not render an opinion on Saczak's cervical limitations and recommended this area be evaluated by a specialist.  (R. at 250.)

On December 4, 2000, Dr. Bertolini examined Saczak and found her shoulder "much improved" with a "full range of motion" limited only by neck pain.  (R. at 258.)  She continued to report neck pain radiating down her arm to her second and third fingers, as well as numbness in her thumb and index finger.  (*Id.*)  Dr. Bertolini recommended that Saczak pursue the surgical options for her neck through Dr. DePhillips and he refilled her Celebrex prescription for pain. (R. at 259.)

On January 12, 2001, Dr. Gettleman, a neurosurgeon, examined Saczak. (R. at 233.) Dr. Gettleman noted that Saczak did not appear to be "in any pain whatsoever" and that Saczak stated that her symptoms were intermittent. (*Id.*) She also stated that she experienced numbness in her right hand if she "bends over at the waist and lets her arms hang down," as well as numbness in her thumb and index finger. (*Id.*) Dr. Gettleman reviewed Saczak's medical records and MRI report and opined that he could not clearly identify the actual cause of Saczak's injury. He stated that he could not recommend surgery without reviewing the actual MRI films, and he noted that she could work at a light-duty capacity. (R. at 236.)

On January 16, 2001, Dr. Bertolini refilled Saczak's prescription for Celebrex and Vicodin. (R. at 259.)

On February 2, 2001, Dr. Gettleman reviewed Saczak's MRI films and diagnosed degenerative spurs and disc herniation at C5-6 and disc herniation at C6-7. (R. at 232.) Dr. Gettleman did not recommend surgery and noted that during his examination Saczak appeared to be "symptom-free." (R. at 231.) He recommended that she receive a functional capacity evaluation. (*Id.*)

On March 6, 2001, Saczak visited Dr. Bertolini and complained of continued neck pain. (R. at 259.) Saczak stated that she did not have cervical surgery because it had not been approved by her insurance company. (*Id.*) Dr. Bertolini found tenderness in Saczak's neck and pain at the extreme range of motion. (*Id.*) He told Saczak that he could not help her with her neck pain and recommended that she work with Dr. DePhillips to resolve the issue. (*Id.*) Dr. Bertolini refilled her prescription for Celebrex and Vicodin and released her to the care of Dr. DePhillips. (*Id.*)

On March 20, 2001, Saczak underwent a functional capacity evaluation, after which it was determined that she could return to work at a "modified light physical demand level." (R. at 237.) The assessment noted that she could not return to work as a housekeeper, as this is considered a medium demand level. During the assessment, Saczak exhibited decreased grip strength with her right hand and complained of numbness in her right arm. (*Id.*)

On April 5, 2001, Dr. DePhillips reported that the cervical surgery could not be scheduled because it had not been authorized by Saczak's insurance carrier. Moreover, he declined to prescribe additional pain medication pending authorization for further payment. (R. at 160.)

On August 20, 2002, Saczak returned to Dr. DePhillips for a follow-up and complained of continued pain in her neck radiating down her right arm. (*Id.*) Saczak stated that the numbness had now spread to her third finger, and Dr. DePhillips noted that she could not return to work and was functioning at a "sedentary" level. He again recommended the surgical option. (*Id.*)

On June 6, 2003, Saczak was examined by Dr. Goldberg. (R. at 206-10.) Dr. Goldberg found "very limited" cervical flexion and decreased sensation in the right C6-7 distributions, and he affirmed a diagnosis of degenerative disc disease. (R. at 208-09.) He noted that Saczak had "failed non-operative care" and thus recommended surgery, to which Saczak agreed. (R. at 209.) Dr. Goldberg also recommended an additional MRI scan prior to surgery. *Id.*

On July 7, 2003, Saczak underwent an MRI scan at Riverside Medical Center, which showed a large disc bulge at C5-6 causing moderate to severe spinal stenosis. (R. at 267.) The MRI scan also indicated a mild disc bulge at C6-7 causing moderate spinal stenosis. *Id.*

On July 17, 2003, Dr. Goldberg performed a cervical discectomy and spinal fusion at C5-6 and C6-7 on Saczak. (R. at 278.) On August 20, 2003, Dr. Goldberg cleared Saczak to return to work at a sedentary level, and recommended that she begin physical therapy. (R. at 286.) On October 29, 2003, Dr. Goldberg conducted a follow-up assessment of Saczak and found that she had good range of motion in the cervical spine. (R. at 223.) She stated that she still had numbness and diminished sensation in her upper arm. (*Id.*)

On December 18, 2003, Saczak was involved in a motor vehicle accident. (R. at 220.) On December 29, 2003, she was treated for lower back and right leg pain and was diagnosed with a lumbar strain. (*Id.*) X-rays taken at the time revealed no acute fractures or dislocations. (*Id.*)

On December 29, 2003, Dr. Goldberg examined Saczak, and although Saczak reported low back and right leg pain, he found that her lumbar spine was normal. (R. at 219.) He prescribed Neurontin and Vicodin, referred her to rehabilitative therapy and limited Saczak to sedentary work. (*Id.*)

On October 25, 2004, Saczak was admitted to Provena St. Joseph Medical Center complaining of a one-week history of difficulty urinating, urinary retention, bloody stool, urge to urinate and blood from her rectum, which she attributed to hemorrhoids. (R. at 330, 337.) She was diagnosed with kidney cancer, and she underwent surgery to remove her left kidney. (R. at 330.)

**Discussion**

A district court's review of an ALJ's decision is limited to determining whether the decision "is both supported by substantial evidence and based on the proper legal criteria." *Ehrhart v. Sec'y of Health & Human Servs.,* 969 F.2d 534, 538 (7th Cir. 1992). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "[W]e review the entire administrative record, but do not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). The critical question is not whether the claimant is disabled, but, rather, "whether the ALJ's finding of non-disability is supported by substantial evidence in the record." *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If reasonable minds could disagree as to whether the claimant is disabled, a court must affirm the ALJ's decision denying benefits. *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## I. Credibility Determination

Saczak first argues that the ALJ erred by failing to evaluate her credibility properly. (Pl.'s Br. 9-13.) An ALJ's credibility finding will not be set aside unless it is patently wrong and unsupported by the evidence in the record. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). "If the allegation of pain is not supported by the objective medical evidence in the file . . . then the ALJ must obtain detailed descriptions of claimant's daily activities . . . ." *Id.* (citing *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994)). Per Social Security Ruling 96-7p, the ALJ's credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the

individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." However, the ALJ's determination should not be reversed solely because the ALJ did not "specify which statements were incredible." *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003).

In this case, the ALJ conducted an extensive survey of the objective medical evidence that contradicted Saczak's testimony. (R. at 34-39.) While Saczak testified in the administrative hearing that she experienced difficulties in her daily life after her shoulder injury in September 1999 until her date last insured in September 2000, there is little, if any, medical evidence supporting her claims of disabling pain during that period. (R. at 516-18.) The ALJ addressed the findings of each doctor who examined Saczak and determined that their findings were not consistent with Saczak's testimony that her level of pain during that period was disabling. (R. at 34-39.)

Saczak first argues that the ALJ failed to assess her credibility properly because of the ALJ's allegedly conclusory finding that Saczak's testimony was "not entirely credible for the period between her alleged onset date and date last insured." (Pl.'s Br. 9; R. at 39.) Saczak takes the ALJ's conclusion out of context. The ALJ's finding was not conclusory, but, instead, is supported by references to the record that contradict Saczak's testimony of disabling pain. The ALJ noted that Saczak's initial treatment by Drs. Rodarte and Goldhaber on September 28 and September 30, 1999, respectively, revealed no abnormalities or edema in her shoulder. (R. at 35.) Moreover, the ALJ observed that Saczak was advised to start physical therapy and return to work on light duty, neither of which she did. (*Id.*) The October 19, 1999 examination at Riverside and the May 20, 2000 x-ray revealed no abnormalities in her shoulder, even though

she continued to complain of pain. (*Id.*) The ALJ also pointed out that Saczak failed to pursue additional treatment for nearly a year, until her September 2000 visit to the emergency room "a year after her initial injury and a few days before her Title II insurance ended." (R. at 37.) The ALJ stated that "[Saczak's] failure to pursue more aggressive treatment before she was last insured . . . undermines her allegations that her symptoms, including pain, were at a *disabling* level of severity at that time." *Id.* (emphasis added). Because the ALJ supported her findings as to Saczak's credibility with specific reasons based on the evidence in the record, this Court concludes that the ALJ's credibility finding did not violate Social Security Ruling 96-7p.

Saczak next argues that the ALJ improperly considered her failure to pursue treatment in making the credibility determination. (Pl.'s Br. 10.) Saczak correctly points out that the ALJ may not draw "any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide . . . ." Soc. Sec. Ruling 96-7p. However, in this case, the ALJ considered Saczak's explanation that she failed to pursue treatment because she lacked insurance. (R. at 37.) However, the ALJ found that this explanation was inconsistent with Saczak's claims of a disabling level of pain because Saczak failed "to pursue more aggressive treatment before she was last insured." (*Id.*) The ALJ emphasized that Saczak failed to begin physical therapy in September 1999 as directed by her doctors and did not pursue additional treatment until September 2000. (*Id.*) It was not until October 2000, *after* her insurance had expired, that Saczak finally began to seek treatment consistently. (*Id.*) As a result, the ALJ found that Saczak's explanation that she did not seek treatment because she lacked insurance was inconsistent with her actions. (*Id.*) The ALJ's finding thus satisfies Social Security Ruling

12

96-7p's requirement that the ALJ consider the applicant's explanation before making an inference based on the failure to seek treatment.

Saczak next argues that the ALJ failed to analyze her pain properly under SSR 96-7p. (Pl.'s Br. 10.) SSR 96-7p requires that the ALJ consider the plaintiff's description of her daily activities in assessing the impact of her pain. However, where a claimant's allegations of pain are not supported by the medical evidence, the ALJ must turn to the observations of treating and examining physicians. *See Zurawski*, 245 F.3d at 887-88.

While the ALJ readily conceded that the record showed Saczak experienced pain prior to her date last insured, the ALJ concluded that there was no evidence that the pain was disabling. (R. at 39.) The ALJ pointed to several examples showing that any limitation caused by Saczak's condition was, at most, intermittent. The January 12, 2001 examination showed that Saczak reported numbness when she bent forward and hung her arms down in front of her, but the ALJ observed that in that same exam "she did not describe ongoing numbness or numbness with activity." (R. at 37.) Additionally, the ALJ noted that Saczak had "normal upper extremity strength." (*Id.*) Similarly, the ALJ indicates that the March 20, 2001 functional capacity examination found Saczak "capable of frequent simple grasping and frequent firm grasping with *both* hands." (*Id.* (emphasis added).) Neither of those examinations nor any other examination indicated that Saczak was disabled by her condition prior to the date last insured. (*Id.*)

Additionally, the ALJ relied on opinion evidence that contradicted Saczak's allegations of disabling pain. While the ALJ acknowledged that the report of Dr. Fischer imposed significant limitations on Saczak, the ALJ found that other reports were more persuasive and consistent with the objective medical evidence. (*Id.*) For instance, the ALJ gave great weight to

the finding of the shoulder specialist Dr. Cole, who found that Saczak had no limitations in her shoulder. (*Id.*) Regarding Saczak's spinal condition, the ALJ observed that Dr. DePhillips' opinion was that the October 3, 2000 MRI scan showed a disc herniation requiring a discectomy. (*Id.*) However, the ALJ found that Dr. DePhillips' opinion was contradicted by the actual MRI report and the opinion of "every other doctor" that the MRI scan showed only "degenerative changes . . . with small central herniated discs . . . with no evidence of spinal stenosis or nerve root impingement." (*Id.*) Even if the October 2000 MRI scan, which was taken after the date last insured, could be considered to represent accurately Saczak's condition during her insurance period, several doctors found that Saczak's condition was not disabling at that time. (*Id.*) Moreover, the ALJ took into account the significant changes shown in the July 2003 MRI scan, which revealed "larger disc herniations and mild to moderate spinal stenosis." (*Id.*) The ALJ found the changes between the MRI scans to be significant evidence that Saczak's disability developed at some point after her first MRI scan rather than before her date last insured. (*Id.*) Perhaps the most persuasive evidence is that Dr. Gettleman noted that during his examination Saczak failed to manifest any symptoms of pain at all. (R. at 36.) Indeed, even after Dr. Gettleman reviewed her MRI films, he specifically did not recommend surgery because she appeared to be "symptom-free." (R. at 231, 233.) Accordingly, due to all of the considerations outlined herein, the Court holds that the ALJ satisfied the requirements of SSR 96-7p by conducting an extensive survey of the objective and opinion evidence that contradicted Saczak's claims of disabling pain.

Finally, Saczak argues that the ALJ did not properly consider the effects of Saczak's medication in making the credibility determination. (Pl.'s Br. 12.) Saczak contends that the ALJ

failed to consider the side effects of Saczak's taking Vicodin as well as Tylenol prior to being

prescribed Vicodin.  (*Id.*)  Saczak was not prescribed Vicodin until September 20, 1999, shortly

before her insured status expired.  (R. at 37.)  However, the ALJ found that Saczak did not

actually begin taking the Vicodin until October 2000, after her date last insured.  (*Id.*)  Thus, the

side effects of the Vicodin were not relevant to the credibility determination during the period in

question.  The ALJ considered the fact that Saczak took Tylenol to manage her pain during the

insurance period but found that her "reliance on over-the-counter" medication undercut rather

than supported her allegations of a disabling level of pain.  As a result of this analysis, the ALJ

properly considered the effects of the relevant medication in making her credibility

determination in compliance with SSR 96-7p.

In sum, there is nothing in the record to indicate that the ALJ's credibility determination

as to Saczak was patently wrong.  Moreover, for the reasons discussed above, the ALJ's

determination is amply supported by evidence in the record.


## II.  Residual Functional Capacity

Saczak next argues that the ALJ failed to analyze her Residual Functional Capacity

("RFC") properly.  (Pl.'s Br. 13-17.)  The ALJ determined that Saczak had an RFC to

> perform unskilled work that required frequent lifting and/or carrying of up to ten
> pounds frequently with either arm, and up to 20 pounds occasionally with her non-
> dominant left arm (though she could use her dominant right hand as a helper); could
> not lift above her shoulder with her dominant right arm; and had unlimited ability to
> sit, stand and/or walk.

(R. at 33.)  To determine a claimant's RFC, the ALJ must consider "all of the relevant medical

and other evidence," including objective medical records and subjective testimony from the

claimant and others about the claimant's physical capabilities.  *See* 20 C.F.R. § 404.1545(a)(3).

In analyzing the claimant's condition, the ALJ must "build an 'accurate and logical bridge from

the evidence to [her] conclusion'" to ensure a "meaningful judicial review."  *Scott v. Barnhart*,

297 F.3d 589, 595 (7th Cir. 2002) (quoting *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir.

2002)).  To qualify for disability benefits, the evidence must show that a disabling limitation

existed prior to the date last insured.  *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir.

1997).  Saczak raises several arguments challenging the ALJ's RFC decision.

     First, Saczak argues that the ALJ erred by not including a limitation in her RFC

determination.  (R. at 13.)  Saczak argues that the ALJ's narrative summary of her reasoning

process and the hypothetical questions posed during the administrative hearing are inconsistent

with the ALJ's ultimate RFC determination.  (Pl.'s Br. 13; *see* R. at 33, 38, 520-26.)  However,

the ALJ clearly and logically explains each of the factors that she took into account in making

her determination, including extensive evidence in Saczak's medical records and the testimony

of Saczak herself.  (R. at 33-38.)  As the ALJ observes, "[n]o objective findings support that such

a limitation existed before the date the claimant was last insured," which is the critical time

period for a disability determination.  (R. at 37.)  This observation also applies to Saczak's

contention that the ALJ erred by not providing a limitation regarding Saczak's cervical

condition.  (R. at 14.)  Although it is true that Drs. Bertolini and DePhillips found a slight

limitation in Saczak's range of motion, neither of these physicians examined her prior to her date

last insured.  Finally, contrary to Saczak's contention, there is no requirement that the

hypothetical questions the ALJ asked during the hearing be directly related to or even accounted

for in the final opinion. As a result, the record supports the ALJ's decision not to include a limitation in her RFC.

Second, Saczak contends that the ALJ failed to consider properly the vocational expert's testimony during the administrative hearing. (Pl.'s Br. 14.) The ALJ found that Saczak could perform the jobs of assembler and cashier, consistent with the RFC finding that Saczak could use her hands frequently. (R. at 41.) Saczak argues that this finding is contrary to the expert's testimony that the assembly job would require use of the hands "more than frequently" and that the cashier job would might require repetitive hand use for part of the day. (Pl.'s Br. 14.) Saczak misreads the expert's testimony. The expert testified that sedentary assembler jobs would require more than frequent grasping and thus Saczak would be precluded from those positions. (R. at 527.) However, the expert also testified that there are other light assembly jobs, not in the sedentary category, that only require frequent grasping with the hands. (R. at 526.) Thus, the ALJ was correct in finding that Saczak could perform light assembly work. (R. at 41.) Additionally, the expert testified that the key to whether Saczak could work as a cashier was whether she could "make change out of a dish drawer." (R. at 531.) The expert testified that a cashier could "make change with the non-dominant hand and use the other . . . hand as an assist . . . ." (R. at 522.) Even if Saczak could not use her dominant hand for more than frequent grasping, there is nothing in the record indicating that she is unable to use her left, non-dominant hand to make change from a cash drawer. Thus, the ALJ's finding that Saczak could perform both light assembly and cashier jobs is consistent with the record.

Third, Saczak claims that the ALJ ignored the evaluations of Saczak by Dr. Bertolini on

October 3, 2000 and Dr. Goldberg on June 6, 2003 in making the RFC determination. (Pl.'s Br.

15.) The Court addresses each argument in turn.

The ALJ did not ignore Dr. Bertolini's evaluation of Saczak. In fact, the ALJ cited

Exhibit 1F/7 when making the RFC determination. (R. at 37 (citing Ex. 1F/7, R. at 165).)

Exhibit 1F/7 is an MRI Report ordered by Dr. Bertolini on October 3, 2000 and reviewed by Dr.

Chen, who stated that: (1) "There is no evidence of acute fracture or dislocation."; (2) "Evidence

of spur formation between C5-6 in midline. There is also a smaller one between C6-7 at midline,

toward the right, both showing compression to the thecal sac."; (3) "There is no evidence of

spinal stenosis."; (4) "The signal of the spinal cord is unremarkable."; (5) "The paravertebral soft

tissues are normal."; (6) "Small central herniated discs C5-6 and C6-7." (R. at 165.) The ALJ

explained that this MRI Report showed only degenerative changes in the lower cervical spine

with impingement that should not have caused the amount of pain claimed. (R. at 37.) Because

the MRI Report reflects conclusions that mirror those of Dr. Bertolini during his October 3, 2000

examination of Saczak, the Court cannot conclude that the ALJ's RFC determination was not

supported by substantial evidence. *See Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004)

("[A]n ALJ need only minimally articulate his or her justification for rejecting or accepting

specific evidence of a disability . . . . [and] the ALJ need not provide a written evaluation of

every piece of evidence.") (quotation omitted).[1]

_____

[1]Further, Dr. Bertolini's October 3, 2000 examination does not establish that Saczak was unable to perform unskilled work that required frequent lifting and/or carrying of up to ten pounds frequently with either arm, and up to twenty pounds occasionally with her non-dominant left arm (though she could use her dominant right hand as a helper); could not lift above her shoulder with her dominant right arm; and had unlimited ability to sit, stand and/or walk. Dr. Bertolini noted that Saczak merely experienced some pain on rotation of her shoulder and neck pain at the extreme range of motion. (R. at 167.) He found Saczak had weakness in wrist

18

Further, Dr. Goldberg did not examine Saczak until 2003. (R. at 206-10.) Because there was an almost three-year gap between the expiration of Saczak's insurance period on September 30, 2000 and Dr. Goldberg's examination on June 6, 2003, his findings and conclusions bear little, if any, weight as to whether she was disabled as of September 30, 2000. The ALJ was thus within her discretion to disregard Dr. Goldberg's evaluation of Saczak.

Saczak further argues that the ALJ erred by stating that her condition worsened in the years after she was last insured. (Pl.'s Br. 16.) Saczak opines that the fact that her condition worsened does not mean that her condition was not disabling as of September 2000. (*Id.*) While this may be true, the converse is equally true, *i.e.*, simply because Saczak became disabled at some point after September 2000 does not necessarily mean that she was disabled prior to that date.

Saczak also claims that the ALJ mischaracterized the testimony of Dr. Ezike, the medical expert at the administrative hearing. (*Id.*) The ALJ stated that Dr. Ezike testified that "neither the objective findings on the October 3, 2000 MRI scan nor the physical findings on examination warranted a two-level fusion as of that date . . . ." (R. at 36.) This Court finds this to be a reasonable characterization of Dr. Ezike's testimony. Dr. Ezike testified that

---

extension of her right wrist and decreased sensation in her first two fingers. (*Id.*) Dr. Bertolini reviewed the x-rays of Saczak's right shoulder taken in the emergency room on September 19, 2000 and found that they were within "normal limits." (*Id.*) Dr. Bertolini diagnosed a probable herniated disc at C5-6, as well as impingement syndrome in Saczak's right shoulder. (*Id.*) He prescribed Celebrex and Vicodin for pain, as well as physical therapy three times a week for two weeks for Saczak's shoulder. (R. at 167-68.) Although Dr. Bertolini noted that surgery was an option, neither his diagnosis nor recommendation indicates that Saczak was disabled. As the ALJ intimated, the fact that Saczak did not actually undergo surgery until 2003, when Dr. Goldberg determined that all non-surgical options were exhausted, lends weight to the inference that Saczak's condition as of September 30, 2000 was not disabling.

> [t]he first MRI that was done in 2000 did show herniated [sic] disc that was small
> without evidence of spinal stenosis. However, a repeat MRI that was done in 2003
> … again showed the spinal, showed the disc herniation but now she had a moderated
> to serious spinal stenosis *and that was why she was referred to have surgery*.

(R. at 509 (emphasis added).) It is apparent from this testimony that Saczak was only referred to surgery in 2003 because the spinal stenosis caused by the herniated disc had progressed to the point where surgery was necessary to correct the problem. This interpretation is supported by the fact that on October 20, 2000, Dr. DePhillips recommended the epidural steroid treatment prior to considering a surgical option. (R. at 162.) Thus, Dr. DePhillips apparently considered surgery to be only one option, rather than the only possible medical solution at that time. Based on the record, this Court does not find that the ALJ mischaracterized Dr. Ezike's testimony.

Fourth and finally, Saczak argues that the ALJ's failure to consider her obesity and renal cell carcinoma as part of the RFC determination warrants remand. (Pl.'s B. at 16.) Regarding her obesity, Saczak relies on *Clifford v. Apfel*. 227 F.3d 863 (7th Cir. 2000). In that case, the plaintiff applied for benefits based on a disability resulting from a variety of health issues including high blood pressure, arthritis in her legs, pain in her hands, and back and nerve problems. *Id*. At the administrative hearing, the *Clifford* plaintiff was 53 years old, 5'3" tall, and weighed 199 pounds, a physical profile very similar to Saczak's. *Id.* The Seventh Circuit held that the ALJ was required to consider the plaintiff's weight along with "the aggregate effect of her other impairments." *Id.* at 873. The court noted that "the evidence should have alerted the ALJ that Clifford had another relevant impairment that could contribute to the cumulative effect of her other impairments." *Id.*

While Saczak's obesity level is similar to the plaintiff's in *Clifford*, that is the extent of the similarity between the cases. The plaintiff in *Clifford* had extensive health problems directly

related to her weight and diet, including arthritis, high blood pressure, and microvascular brain disease resulting in a stroke. *Id.* at 866-67. In contrast, nowhere in the record do any of the doctors who examined Saczak note any health impairments related to her obesity. Unlike in *Clifford,* all of the health problems that Saczak experienced appeared to relate only to her shoulder and neck as a result of her workplace accident. As a result, the ALJ had no reason to believe that Saczak's general physical health had anything to do with her disability claim. Thus, this Court cannot say that it was error for the ALJ not to consider Saczak's obesity in making the RFC determination.

Regarding Saczak's kidney cancer, the ALJ considered this issue and concluded that Saczak lacked objective medical evidence to show "that any malignancy was even suspected" between the date of injury and the date last insured. (R. at 38.) Indeed, during each of Saczak's numerous medical examinations prior to 2004, she consistently reported no significant medical problems other than those related to her shoulder and neck. (*Id.*) When she was admitted to the hospital on October 25, 2004, Saczak asserted that she had experienced difficulty urinating, urinary retention, bloody stool, and urge to urinate *for only one week*. (R. at 330 (emphasis added).) There are two exceptions to this history, but neither was medically linked to kidney cancer during the period prior to her date last insured or at any other time. First, on September 28, 1999, Saczak discussed an unknown gastrointestinal problem with Dr. Rodarte and he suggested that she make an appointment with her regular physician. (R. at 451.) There is no more mention of this issue in the record, and it is unknown whether Saczak sought treatment. Second, on October 25, 1999, Saczak reported rectal bleeding and abdominal pain after she began taking Naprelan. (R. at 457.) She failed to return for an examination, and thus the record

is devoid of any evidence that indicates that the symptoms continued. (*Id.*) The record shows that Saczak did not report another instance of rectal bleeding until she was hospitalized in 2004, which she attributed to hemorrhoids. (R. at 337.) Given that, as of her date last insured, any of Saczak's reported rectal and gastrointestinal symptoms did not appear to be related to her subsequently diagnosed renal cancer, the Court holds that the ALJ's RFC determination is based on substantial evidence.

### III. Evaluation of Listing 1.04A

Saczak's final argument is that the ALJ did not sufficiently explain why she failed to meet the requirements of Listing 1.04. (Pl.'s Br. 17.) To meet Listing 1.04A, the claimant must establish that she has a

> [disorder] of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, *spinal stenosis*, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), *resulting in compromise of a nerve root* (including the cauda equina) or the spinal cord. *With*: A. *Evidence of nerve root compression* . . . .

20 C.F.R. § 404, subpart P, appx. 1 (emphasis added). The ALJ correctly articulated this standard and discussed in detail the evidence presented in the record that supported a finding that Saczak was not impaired under this standard prior to her date last insured. (R. at 33-39.) The ALJ relied on the testimony of Dr. Ezike as well as two state agency physicians in reaching her determination. (R. at 32.) Dr. Ezike testified that "the first MRI did not show [the] spinal stenosis which [Saczak's physicians] document[ed] in 2003 . . . ." The ALJ observed that while the 2000 MRI scan showed disc herniation, there was "no evidence of spinal stenosis or nerve root impingement," as required by Listing 1.04A. (R. at 37.) The ALJ correctly articulated the proper legal criteria, and the disability determination is substantially supported by the record. As

a result, the ALJ did not err in her finding that Saczak did not meet the requirements of Listing 1.04A.

Saczak further argues that she did in fact meet the listing requirements under Listing 1.04A and that the ALJ erred by failing to consider additional evidence. (Pl.'s Br. 18-19.) However, as Saczak herself points out, whether Saczak is in fact impaired under the listing is not the issue before this Court. (Pl.'s Br. 18.) This Court's review is limited only to determining whether the ALJ's decision is supported by the record and based on appropriate criteria. *See Ehrhart*, 969 F.2d at 538. This Court may not re-weigh evidence that the ALJ has already considered and rejected. *See Herr*, 912 F.2d at 180. As a result, Saczak's argument as to this point is not dispositive of the issues before this Court and will not be considered.

## Conclusion

For the foregoing reasons, the Court grant's defendant's motion for summary judgment [doc. no. 21], denies Saczak's motion for summary judgment [doc. no. 19] and terminates this case.

**SO ORDERED**                                    **ENTERED:**

**March 12, 2009**

_Ronald A. Guzman_

_____

**HON. RONALD A. GUZMAN**
**United States Judge**